**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| GARY D. POWERS, II, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 6:20-cv-01136** |
| | § | |
| IAS PARENT HOLDINGS, INC., IAS | § | |
| INVESTCO, INC., ROBERT HUMBLE, | § | **Jury Trial Demanded** |
| and JOHN LUTMAN, | § | |
| | § | |
| *Defendants.* | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

Gary Powers sold his company, Dealer Service Solutions, to IAS after being promised by IAS and Robert Humble that IAS would support him in his opportunity to achieve the full consideration contemplated by the deal. In reliance on those and other promises, Powers accepted a lower up-front purchase price from IAS than what he could have gotten from other potential purchasers, signed overbroad restrictive covenants, and handed over the company that he had built to IAS. After closing of the sale, however, Powers discovered that IAS's promises had been false, and it cost him millions. On top of that, after Powers resigned from the company, IAS purported to fire him "for cause" two weeks before his resignation took effect, and John Lutman (an IAS executive) began disparaging Powers to dealerships in the region in which Powers has made a name for himself. IAS, Humble, and Lutman should be held accountable for their malicious conduct designed to injure Powers both financially and reputationally.

Plaintiff Gary D. Powers hereby files this Original Complaint and alleges, on personal information as to his own conduct and on information and belief as to the conduct of others, as follows:

**THE PARTIES**

1.      Gary D. Powers, II is an individual who is a citizen of the state of North Carolina.

2.      IAS Parent Holdings, Inc.[1] is a Delaware Corporation with a principal place of business in Austin, Texas. Although, according to the Texas Secretary of State records, IAS Parent Holdings has not designated an agent for service of process in Texas, it does list a mailing address of a mailing address of 8201 N. FM 620, Suite 100, Austin, Texas 78726-4032, which is the same as IAS Investco, Inc.'s registered agent.

3.      IAS Investco, Inc.[1] is a Delaware corporation with a principal place of business in Austin, Texas. IAS Investco may be served via its registered agent CSC-Layers Inc., 8201 N. FM 620, Suite 100, Austin, Texas 78726.

4.      Robert Humble is an individual who is a citizen of the State of Texas in Travis County. He may be served with process at his home address of 3800 Hidden Hollow, Austin, Texas 78731, or wherever he may be found.

5.      John Lutman is an individual who is a citizen of the state of Texas who lives in the State of Texas in Denton County. He may be served with process at his home address of 6525 Terrace Drive, The Colony, Texas 75056, or wherever he may be found.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy is in excess of $75,000 and Plaintiff is a citizen of a different state than any Defendant.

7.      This Court has personal jurisdiction over Defendants because they are citizens of the State of Texas and, with the exception of Lutman who resides in Dallas County, reside within

---

[1] IAS Parent Holdings, Inc. and IAS Investco, Inc. are referred to, herein, as "IAS" collectively.

the District. Additionally, IAS has submitted to the jurisdiction of this Court pursuant to Section 9.08(a) of the Securities Purchase Agreement. *See* Exhibit A § 9.08(a).

8.      Venue is proper in this judicial district pursuant to Section 9.08(a) of the Securities Purchase Agreement. *See* Exhibit A § 9.08(a). Venue is further proper in this judicial district over all Defendants pursuant to 28 U.S.C. § 1391(b)(1).

<u>**FACTS**</u>

9.      IAS was founded in 1984 and is headquartered in Austin, Texas. IAS specializes in developing aftermarket programs and F&I (Finance and Insurance) solutions. It is one of the largest F&I product providers in the United States. IAS's customizable solutions include ancillary coverages, retail technology, vehicle service contracts, income development, turnkey reinsurance, training institute, and performance marketing. IAS works with dozens of top 100 dealer groups across the United States.

10.      Powers founded Dealer Service Solutions, LLC, ("DSS") a North Carolina limited liability company, in August 2012. Powers was the sole founder and 100% owner of DSS. DSS operated as a broker on behalf of various Third Party Administrators ("TPA"). DSS sold various F&I products (*e.g.*, extended warranties, GAP insurance, maintenance packages, paint-fab, etc.) on behalf of its TPAs to car, motorcycle, boat, and RV dealerships. The dealerships would sign up directly with the TPAs represented by DSS, and DSS would receive a commission per product sold.

11.      In July 2018, John Lutman suggested to Powers that Powers sell DSS to IAS, where Lutman was a Vice President. Lutman suggested that Powers speak directly with Robert Humble.

12.      Beginning in August 2018, Powers began discussing IAS's possible acquisition of DSS with Humble. At the time, Humble was IAS's Senior Vice President, Strategy & Corporate Development.

13.     In the first conversation between Humble and Powers, on or about August 9, 2018, Humble made at least the following promises to Powers in order to induce him into entering into an agreement with IAS for the sale of 100% of the shares in DSS: 1) Humble promised Powers that the DSS name would never change; 2) Humble promised Powers that Powers would have the same control over DSS as Powers did when DSS was an independent company (including hiring/firing authority, compensation authority, etc.); 3) Humble promised Powers that Powers would have access to IAS resources to manage his accounts; 4) Humble promised Powers that Powers could continue to work with his current IAS representatives, John Lutman and Tabor Davis; and 5) Humble promised Powers that Powers would have access to IAS resources and tools to help grow DSS, which, as a result, would lead to more consideration from the acquisition via earn-out payments.

14.     Also around this time, a company called Easy Care expressed interest in purchasing DSS to Powers.

15.     From August 10 to September 12, 2018, Powers provided Humble various types of information to enable IAS to make an acquisition proposal for the acquisition of DSS.

16.     On or about September 13, 2018, IAS provided Powers with a written acquisition proposal that reiterated the promises that had been made by Mr. Humble. These promises were reiterated with the intent to induce Powers into entering a purchase agreement for IAS to purchase DSS.

17.     Also on September 13, 2018, Powers had a call with Humble, Patrick Brown (Chief Executive Officer of IAS), Mark Rinker (then the Chief Revenue Officer of IAS), and Mike Forsythe (Chief Financial Officer of IAS) at 2:00 p.m. Eastern. On that call, Powers reviewed IAS's acquisition proposal and the IAS executives, including Humble, reiterated the promise that

Powers would have access to IAS resources and assistance to enable him to hit certain earn out incentives contained within IAS's acquisition proposal. IAS and Humble made this promise with the intent to induce Powers into entering into a purchase agreement for IAS to purchase DSS.

18.     Specifically, on September 13, 2018, Humble & IAS represented to Powers that IAS was "the best partner to help accelerate" DSS's growth. They promised "incentives" that would "focus on growth of the business" and that "IAS will do everything commercially reasonable to support the continued growth and vitality of the agency." Humble and IAS made these representations to Powers with the intent to induce Powers into entering into a purchase agreement for IAS to purchase DSS.

19.     IAS and Humble further emphasized the "total consideration potential of $6.0 million," which was nearly double the proposed up-front purchase price.

20.     On September 24, 2018, Powers returned an executed, non-binding letter of intent ("LOI") that laid out the terms for IAS to purchase DSS. The LOI noted a proposed purchase price of $3.34 million (or 4.25x Adjusted EBITDA) and an "earn-out potential" of up to $3.05 million, which would nearly double IAS's purchase price if achieved.

21.     The parties then engaged in due diligence. Had Humble and IAS revealed that they had no intention of fulfilling their promises during this diligence period, Powers would not have agreed to the final terms of the acquisition, but instead would have sold DSS to Easy Care, which would have been worth approximately $2 million more in up-front payments than the offer from IAS.

22.     At least as of this time, if not earlier, IAS was aware DSS worked with TPAs such as IAS, Protective, Simoniz, Southwest Reinsurance, MBPI, Endurance, Ding Shield, US

Warranty, Dealership for Life, The Impact Group, Stone Eagle, Central States of Omaha, GSFS, and ROAD VANTAGE.

23.     The first draft of the purchase agreement for IAS to purchase DSS was provided to Powers in mid-October 2018.

24.     Finally, on November 12, 2018, in reliance on the promises made by Humble and IAS, Powers agreed to terms with IAS for the sale of 100% of the shares of DSS to IAS. The Securities Purchase Agreement ("SPA") was closed on November 15, 2018. *See* Exhibit A. At the time of the closing, IAS knew that DSS was working with other TPAs and allowed DSS to continue to do so under the terms of the SPA. IAS continued to make revenue from any DSS sales of products from other TPAs. Nothing in the SPA prohibits DSS from continuing to sell on behalf of other TPAs. In fact, the SPA specifically contemplates that DSS would continue to do so.

25.     At no point during the pre-LOI discussions, negotiations of the LOI, the due diligence period, or negotiations of the SPA did anyone from IAS disclose that IAS was actively marketing its company for sale. This information was deliberately withheld from Powers by Humble and IAS. Had Powers learned of this information during the diligence period, he would not have executed the SPA with IAS, but would instead have sold DSS to Easy Care, which would have been worth approximately $2 million more in up-front payments than the offer from IAS.

26.     After execution of the SPA, IAS forced Powers to assume the IAS name, contrary to the promises they had made to him to induce him to agree to the SPA.

27.     The SPA provided for up-front consideration of approximately $3 million, with a certain amount to be set aside in an Indemnity Escrow Amount. Ex. A § 2.03. The Indemnity Escrow Amount was required to be included in the Purchase Price. *Id.* IAS has improperly refused to allow the Indemnity Escrow Amount to be paid to Powers.

28.     The SPA defined consideration to also include Earn-Out Payments. The Earn-Out Payments had a maximum value of approximately $3.3 million and were to be paid based upon certain performance targets. Ex. A § 2.08. In order for Powers to become eligible for the Earn-Out Payments, he had to meet certain criteria pursuant to the terms of the SPA. To accomplish those goals and meet those criteria, Powers needed IAS's cooperation and resources. IAS, despite promising to provide Powers with everything he would need to hit or exceed those targets before the sale, after the sale IAS refused to do so.

29.     The SPA includes what purports to be a Noncompetition, Nonsolicitation and Nondisparagement provision. Ex. A § 6.04. The provision contains no geographic restrictions, is for a duration of four years, and contains no limitations on the scope of work Powers would be entitled to engage in. Rather, it purports to prohibit Powers form being affiliated or associated in any capacity with any type of competing business to IAS.

30.     The SPA is to be construed and enforced in accordance with the laws of Texas. Ex. A § 9.07.

31.     Powers never would have executed the SPA if he had known that IAS was going to act in a manner that would prevent him from obtaining the Earn-Out Payments.

32.     The SPA also contained certain Ancillary Agreements executed "in connection with" the SPA. These Ancillary Agreements included an "offer letter" of employment (Section 2.05(a)(vi)), a Noncompetition Agreement (Section 2.05(a)(vii)), and a Confidential Information Agreement (Section 2.05(a)(viii)).

33.     At all times, Powers performed his obligations under the SPA and the Ancillary Agreements.

34.     In connection with the SPA, Powers executed a Noncompetition Agreement with IAS InvestCo, Inc. The Noncompetition Agreement purports to prohibit Powers from contributing his "knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as Employer or the Employer Group, including those engaged in the business of aftermarket vehicle services." Ex. B ¶ 2.2. This restriction lasts for 2 years from the date of Powers's termination of employment.

35.     The Noncompetition Agreement also purports to prohibit Powers, directly or indirectly, soliciting, hiring, recruiting, or attempting to hire or recruit any employee of IAS who has been employed within the last six months prior to Powers's termination of employment. Ex. B ¶ 2.3.

36.     The Noncompetition Agreement also purports to prohibit Powers from, directly or indirectly, solicit, contact, or attempt to solicit or contact, using any other form of communication "to contact or meet with [IAS's] current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by [IAS]. Ex. B ¶ 2.4. This restriction applies to "customers or prospective customers [Powers] contacted in any way" in the last two years before his last day of employment with IAS; customers about whom Powers has trade secrets or confidential information customers who became IAS customers while Powers was employed with IAS; and customers about whom Powers has information that is not publicly available. *Id.*

37.     The Noncompetition Agreement, "for all purposes, will be construed in accordance with the laws of North Carolina without regard to conflicts-of law principles." Ex. B ¶ 8.

38.     The Noncompetition Agreement contains no limitations on geography and purports to prohibit Powers form being affiliated or associated in any capacity with any type of competing business to IAS.

39.     At all times, Powers performed his obligations under the Noncompetition Agreement.

40.     In connection with the SPA, Powers also executed a Confidential Information Agreement with IAS InvestCo, Inc.

41.     The Confidential Information Agreement requires Powers to "hold in strictest confidence" and "not disclose, discuss, transmit, use, lecture upon, or publish" any Confidential Information (as defined within the Confidential Information Agreement) except in connection with his work for IAS. Ex. C ¶ 2.1.

42.     The Confidential Information Agreement "will be governed by and construed according to the laws of the State of Texas without regard to conflicts of law principles." Ex. C ¶ 9.1.

43.     At all times, Powers performed his obligations under the Confidential Information Agreement. Specifically, Powers has never disclosed, discussed, transmitted, used, lectured upon, or published any IAS Confidential Information

44.     In connection with the SPA, Powers also executed an Offer of Employment for the position of Vice President, IAS, Southeastern Sales Division with IAS InvestCo, Inc. (or one of its affiliates). Ex. D. Powers agreed to accept a base salary of $25,000 per month ($300,000 annualized) plus benefits. Powers was an "Exempt" employee who had no required number of hours each month.

45.     In connection with the SPA, Powers also executed an Escrow Agreement. BOKF, NA is also a party to the Escrow Agreement as the Escrow Agent.

46.     The Escrow Agreement required IAS, if it were to submit a claim for indemnity under the SPA, to provide, among other things, "the circumstances giving rise to Buyer's Claim" and "the liquidated amount of Buyer's Claim, or if not liquidated, Buyer's good faith estimate of the amount of Buyer's Claim." Ex. E ¶ 1.3.

47.     The Escrow Agreement further required BOKF, NA to disburse the Fund to Powers if a proper Claim was not received by 5:00 p.m. Central Time on November 15, 2020. The Fund consists of the Indemnity Escrow Amount set forth in the SPA.

48.     On November 15, 2020, IAS submitted what purported to be a "Claim" under the Escrow Agreement but that failed to satisfy all of the requirements of the Escrow Agreement under Paragraph 1.3.

49.     Despite IAS's submission of a "Claim" that did not satisfy the requirements under the Escrow Agreement, BOKF, NA has not disbursed the Fund to Powers. Even now, IAS has never provided any evidence of a specific claim or loss.

50.     At all times, Powers performed his obligations under the Escrow Agreement.

51.     After the closing of the SPA, Powers began his work on behalf of IAS. He remained the face of the business for all of the DSS customers who came to IAS as part of the acquisition. Almost immediately, IAS failed to live up to the promises they had made to induce Powers into executing the SPA.

52.     IAS forced Powers to use the IAS name. IAS refused to allow Powers to hire people to grow the former DSS business. IAS required Powers to fire employees, which also hindered growth. IAS did not provide Powers with the access to resources that Humble had promised

Powers, which prevented Powers from growing the business. IAS took these material steps to deny Powers the ability to achieve his Earn-Out under the SPA.

53.     Powers attempted to convince IAS and Humble to live up to their promises, but they continued to fail to come through. Nevertheless, Powers worked diligently to develop as much business for the former DSS business as possible, all for the benefit of IAS. IAS benefitted greatly from Powers's contributions.

54.     After receiving Powers's resignation, IAS made no effort to work with Powers in the transition, no effort to discuss an exit strategy, no effort to review current accounts, and no effort to review prospective clients.

55.     The largest of the DSS client accounts was Johnson Automotive, based out of Raleigh. Powers had been working with Johnson Automotive since 2014 for P&C or F&I products. Each of Johnson Automotive's dealerships had between one and four IAS products. In total, Johnson Automotive offered seven to nine products at each of its locations in Maryland, North Carolina, and Florida from seven different TPAs, one of which was IAS. The others were Protective, MBPI, Simoniz, Ding Shield, Southwest Reinsurance, and The Impact Group. This was known to IAS.

56.     In early 2020, Johnson Automotive called a meeting with Powers, the purpose of which was to announce Johnson Automotive would be making a change and all of its stores would be moving to one hundred percent Lexus Financial products, which would eliminate Powers's role with Johnson Automotive, along with IAS's.

57.     One of the Johnson TPAs sold by DSS for IAS's benefit, after the acquisition, was Protective. Powers informed Johnson Automotive that Protective's agreement with Johnson Automotive would have penalized Johnson Automotive for leaving Protective. Powers used this

to keep Johnson Automotive from deciding to switch to 100% Lexus Financial products. This would protect and generate revenue to DSS, which belonged to IAS. Johnson Automotive decided it would accept a full suite of products from Protective (instead of Lexus Financial) to replace IAS, Simoniz, Ding Shield, and MBPI products throughout all of their stores. By convincing Johnson Automotive to go with Protective, Powers prevented a significant additional revenue loss for IAS.

58.     By the end of summer 2020, Johnson Automotive still had not executed the contract to make the change to Protective.

59.     In or around that time frame, David Chang, the business director for Johnson Automotive, requested that a promotion be put on with a year-end Cash Bash and Contest that would allow him to stem turnover in the Johnson Automotive sales staff. This type of promotion is common in the industry and is something that, as IAS knew, DSS had been doing since 2012. Powers agreed to do the Cash Bash and Contest for the period August to December 2020. The promotion was paid from the portion of the commissions that would have gone to IAS.

60.     At all times, Powers kept IAS informed about the Cash Bash and Contest. Powers provided IAS with a spreadsheet each month that included payees, dealership of employment, and total amount paid (including a breakdown by product(s)). Using this spreadsheet, IAS made payments under the Cash Bash and Contest. To make these payments,  IAS moved money from a Bank of America account to either load a Netspend card to be delivered to the recipient or write a check directly to the recipient. In some instances, IAS paid a business owned by the recipient of the promotion funds.

61.     Eventually, the continued failure of IAS and Humble to fulfill their promises made it impossible for Powers to continue working for IAS. On October 20, 2020, Powers resigned from

IAS, with his last day to be November 30, 2020. Powers deliberately included a long notice period to assist with the transition of the DSS business.

62.     After submitting his resignation, Powers continued to work for the benefit of IAS.

63.     On October 23, 2020, Powers received the Protective dealer agreement from Johnson Automotive. Three days later, on October 26, Powers sent a spreadsheet to his office manager outlining changes within Johnson in the tab for November 2020. This spreadsheet made clear that changes were being made at Johnson. Powers's office manager then forwarded the spreadsheet to others within IAS.

64.     At no point did Powers ever have any association with Protective, and Powers received no individual benefit from Johnson's switch to Protective.

65.     In early November 2020, there was a bi-weekly call at which the forty-percent increase in Johnson Automotive sales was discussed. John Lutman was on the call. Powers and Clausen Morrell explained that it was due to the year-end Cash Bash and Contest. In response, John Lutman texted Powers to ask about the increase. Lutman did not complain about the Cash Bash and Contest, even though he was fully aware it was going on. In fact, Lutman asked if there was any chance that Powers would stay with IAS in another, different role.

66.     On November 12, in an email to John Lutman, among others, Clausen Morrell confirmed that the year-end Cash Bash and Contest had been discussed on recent calls and had been a common practice.

67.     On November 16, 2020—two weeks before Powers's scheduled last day with IAS—IAS terminated Powers without cause. Since terminating Powers, IAS has refused to release the Indemnity Escrow Amount or pay his final salary through November 30, 2020, which would have amounted to an additional $12,500.

68.     As of November 5, 2020, the Indemnity Escrow Amount had been confirmed by BOKF, NA as $312,003.72. BOKF, NA indicated to Powers that they intended to wire the balance on November 16. IAS's deficient and improper notice, as set forth above, has caused BOKF, NA to refuse to release the Indemnity Escrow Amount.

69.     After terminating Powers without cause, Lutman and others began to defame and disparage Powers. For example, Lutman began making false statements to Johnson Automotive about how Powers had kept IAS in the dark about the year-end Cash Bash and Contest, and that Powers had been using money that should have gone to Johnson Automotive to pay the year-end Cash Bash and Contest.

### COUNT I: FRAUDULENT INDUCEMENT
(*IAS Parent Holdings, Inc., IAS InvestCo, Inc. Robert Humble*)

70.     Powers incorporates the preceding paragraphs as if fully set forth herein.

71.     As set forth above, IAS and Humble made representations regarding the assistance IAS would offer Powers to grow the DSS business and meet his Earn Out requirements, and omissions about the active efforts to Sell IAS.

72.     IAS and Humble made those material representations and material omissions with no intention of fulfilling them.

73.     IAS and Humble's representations were false.

74.     IAS and Humble were aware that their representations were false.

75.     IAS and Humble intended Powers to rely upon those misrepresentations and Powers did in fact rely upon them.

76.     The omissions were material because Powers could have obtained a significantly higher up-front payment had he not entered into the SPA. IAS had a duty to disclose its active efforts to sell IAS because it created a false impression by disclosing the value Powers could

achieve with IAS based on IAS's full cooperation and assistance when, instead, IAS and Humble planned to cut costs and refuse to expend capital to provide assistance to make the company more attractive in a sale. Therefore, IAS and Humble had a duty to disclose the whole truth.

77.     IAS and Humble knew Powers was ignorant of the fact that IAS was actively marketing itself for an acquisition.

78.     By deliberately remaining silent, IAS and Humble intended Powers to rely without this information and to rely on their omission and concealment.

79.     Powers justifiably relied on IAS and Humble's omission by foregoing an opportunity to sell DSS to Easy Care and instead executing the SPA.

80.     These misrepresentations and omissions have caused significant damages to Powers.

81.     Powers seeks all of his actual damages, and because IAS and Humble fraudulently induced Powers into the SPA with malice, knowledge, and intent, IAS and Humble are also liable for exemplary damages.

### COUNT II: BREACH OF SECURITIES PURCHASE AGREEMENT
(*IAS Parent Holdings, Inc., IAS InvestCo, Inc.*)

82.     Powers incorporates the preceding paragraphs as if fully set forth herein.

83.     The SPA is a valid and enforceable contract.

84.     Powers performed his obligations under the SPA.

85.     IAS breached the SPA by, for example, actively and unjustifiably preventing the payout of the Indemnity Escrow Agreement to Powers pursuant to Section 2.03.

86.     IAS breached the SPA by, for example, actively and unjustifiably preventing the Indemnity Escrow Amount from being released to Powers in accordance with the SPA and the Escrow Agreement pursuant to Section 2.07.

87.     IAS breached the SPA by, for example, actively and unjustifiably withholding the resources necessary for Powers to achieve the Earn-Out Payments in accordance with Section 2.08.

88.     As a direct and proximate result of IAS's material breaches, Powers suffered actual damages.

89.     Powers also seeks his attorneys' fees and costs (as applicable) under Texas Civil Practice & Remedies Code Chapter 38 and the indemnification provisions of the SPA.

## COUNT III: BREACH OF ESCROW AGREEMENT
### (*IAS Parent Holdings, Inc., IAS InvestCo, Inc.*)

90.     Powers incorporates the preceding paragraphs as if fully set forth herein.

91.     The Escrow Agreement is a valid and enforceable contract.

92.     Powers performed his obligations under the Escrow Agreement.

93.     IAS breached the Escrow Agreement by submitting a purported "Claim" that did not meet the requirements under the Escrow Agreement, which prevented disbursement of the Fund to Powers.

94.     As a direct and proximate result of IAS's breaches, Powers suffered actual damages.

95.     Powers also seeks his attorneys' fees under Texas Civil Practice & Remedies Code Chapter 38.

## COUNT IV: BREACH OF OFFER OF EMPLOYMENT
### (*IAS Parent Holdings, Inc., IAS InvestCo, Inc.*)

96.     Powers incorporates the preceding paragraphs as if fully set forth herein.

97.     The Offer of Employment is a valid and enforceable contract.

98.     Powers performed his obligations under the Offer of Employment.

99.     IAS breached the Offer of Employment by, for example, improperly terminating Powers without cause and not paying him his entire monthly salary, as agreed in the Offer of Employment.

100.    As a direct and proximate of IAS's material breach, Powers suffered actual damages.

101.    Powers also seeks his attorneys' fees under Texas Civil Practice & Remedies Code Chapter 38.

## COUNT V: DECLARATORY JUDGMENT OF UNENFORCEABILITY
*(IAS Parent Holdings, Inc., IAS InvestCo, Inc.)*

102.    Powers incorporates the preceding paragraphs as if fully set forth herein.

103.    As set forth above, IAS has accused powers of violating his noncompete restrictions.

104.    Based on the foregoing, a controversy exists between Powers and IAS as to their rights and statuses under the SPA and the Noncompetition Agreement. This controversy is definite, concrete, and immediate, and warrants the issuance of declaratory relief, which would resolve the controversy.

105.    Powers requests a declaration of his rights under the SPA and the Noncompetition Agreement as follows:

> a.     the Noncompetition and Nonsolicitation provisions in Section 6.04 of the SPA are overbroad and unenforceable under Texas law;
>
> b.     Sections 2.2 and 2.4 of the Noncompetition Agreement are overbroad and unenforceable under North Carolina law;
>
> c.     Section 6.04 of the SPA and Sections 2.2 and 2.4 of the Noncompetition Agreement are not enforceable due to a prior material breach; and

d.      Section 6.04 of the SPA and Sections 2.2 and 2.4 of the Noncompetition

Agreement are not enforceable because they were obtained by fraud.

### COUNT VI: DEFAMATION
(*John Lutman*)

106.    Powers incorporates the preceding paragraphs as if fully set forth herein.

107.    Lutman published statements of fact that referred to Powers, when he told Johnson

that Powers had never informed Lutman or IAS of the year-end Cash Bash and Contest and that

Powers had deliberately withheld that information from Lutman and IAS. Lutman additionally told

Johnson that Powers had taken money that should have gone to Johnson and used that to pay the

Cash Bash and Contest promotion awards.

108.    Lutman's statements were defamatory and false.

109.    Lutman made the statements with actual knowledge that the statements were false,

which demonstrates that he acted with actual malice. Alternatively, Lutman acted negligently with

regard to the truth of the statement.

110.    The statements made by Lutman injured Powers's reputation and expose Powers to

public hatred, contempt or ridicule, or financial injury, as well as impeach his honesty, integrity,

virtue, and reputation. Tex. Civ. Prac. & Rem. Code. § 73.001.

111.    Powers has requested that Lutman issue a complete retraction of his false

statements.

112.    As a direct and proximate result of Lutman's statements, Powers suffered injury.

113.    Lutman acted with actual malice and a specific intent to substantially injure or harm

Powers. Accordingly, Powers seeks exemplary damages.

### COUNT VII: CONSPIRACY
(*IAS Parent Holdings, Inc., IAS InvestCo, Inc., Robert Humble, John Lutman*)

114.    Powers incorporates the preceding paragraphs as if fully set forth herein.

115.    IAS, Humble, and Lutman are two or more persons.

116.    IAS, Humble, and Lutman combined with the unlawful purpose of defrauding Powers, as set forth above.

117.    IAS, Humble, and Lutman reached a meeting of the minds and one or all of them committed unlawful, overt acts in furtherance of their fraudulent object.

118.    As a result, IAS, Humble, and Lutman are jointly and severally liable for the injury to Powers as a result of their steps to defraud Powers, as set forth above.

## JURY DEMAND

119.    Plaintiff hereby demands a trial by jury on all issues.

## PRAYER FOR RELIEF

For these reasons, Powers respectfully requests the Court award Powers:

a.    Actual, direct, unjust enrichment, indirect, special, incidental, and consequential damages, jointly and severally against all defendants;

b.    Reasonable attorneys' fees, expenses, court fees, and associated costs, jointly and severally against all defendants;

c.    Pre- and post-judgment interest;

d.    Declaratory relief, as requested above; and

e.    Such other and further relief, whether legal, equitable, or otherwise, to which Powers may be entitled in equity or law.

Dated:  December 11, 2020                    Respectfully submitted,

                                             /s/ *Joseph Y. Ahmad*
                                             Joseph Y. Ahmad
                                             Texas Bar No. 00941100
                                             joeahmad@azalaw.com
                                             Jason S. McManis
                                             Texas Bar No. 24088032
                                             jmcmanis@azalaw.com
                                             **AHMAD, ZAVITSANOS, ANAIPAKOS,**
                                               **ALAVI & MENSING P.C.**
                                             1221 McKinney Street, Suite 2500
                                             Houston, TX 77010
                                             Telephone: 713-655-1101
                                             Facsimile: 713-655-0062

                                             **ATTORNEYS FOR PLAINTIFF GARY
                                             D. POWERS, II**