IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **GARY D. POWERS, II**<br>　*Plaintiff,*<br><br>v.<br><br>**IAS PARENT HOLDINGS, INC., IAS INVESTCO, INC., ROBERT HUMBLE, and JOHN LUTMAN,**<br>　*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:20-cv-01136 |

### IAS PARENT HOLDINGS, INC. AND IAS INVESTCO, INC.'S ORIGINAL COUNTERCLAIM AGAINST PLAINTIFF GARY D. POWERS, II

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW IAS PARENT HOLDINGS, INC. AND IAS INVESTCO, INC. (collectively "IAS") and file this Original Counterclaim against Plaintiff Gary D. Powers, II ("Powers"), Counter-Defendant, and respectfully shows the Court as follows:

### I. PARTIES

1. Plaintiff/Counter-Defendant Powers has already made an appearance herein.

2. Defendants/Counter-Plaintiff IAS has already made an appearance herein.

### II.
### JURISDICTION AND VENUE

3. Complete diversity exists over the parties because Plaintiff is a citizen of the State of North Carolina, and Defendants IAS are citizens of Delaware and Texas. The amount in controversy exceeds $75,000.00, and this Court therefore has original jurisdiction over IAS' claims pursuant to 28 U.S.C. §1332.

4. Venue is proper in this judicial district pursuant to Section 9.08(a) of the Securities Purchase Agreement. Venue is further proper in this judicial district over all Defendants pursuant to 28 U.S.C. § 1391(b)(1).

1

## III.
### FACTUAL BACKGROUND

5. This is a case about a business owner who sold his small agency to a larger company, later regretted the decision, obliterated an important client relationship, and then destroyed evidence before resigning.

***IAS bought DSS from Powers, who stayed on to run the office.***

6. IAS (Counter-Plaintiff) specializes in developing aftermarket programs and Finance and Insurance ("F&I") solutions in the auto industry. These are the types of products that are added to the purchase of a vehicle, such as vehicle service contracts, GAP insurance, etc.

7. Powers (Counter-Defendant) owned a smaller agency called Dealer Service Solutions, LLC ("DSS"), which also sold various F&I products and acted as an agent for other companies who also issued or administered F&I products.

8. In 2018, Powers sold DSS to IAS in a securities purchase agreement (the "SPA").

9. Under the SPA, approximately one-tenth of the purchase price was paid into an escrow account (the "Escrowed Funds") in the event of a dispute in the first two years.

10. The SPA contemplated an upfront purchase price as well as earn-out payments. Such earn-out payments were meant to incentivize a seller to stay on with the company and run a former agency's office, with substantial payments for performance at certain levels for a set period; in Powers' case, for two years.

***Powers received more support than any other office but still did not meet sales goals.***

11. Immediately after closing and throughout the earn-out period, IAS made repeated overtures to support Powers in development of business. In November 2018, Defendant John Lutman ("Lutman") went to North Carolina to help get the new office going. In December 2018, Powers and IAS communicated about training for DSS producers. In January 2019, Lutman

went with Powers to visit his largest client—Johnson Automotive. Despite these overtures, Powers rejected much of the support and advice provided by IAS, asserting that during the two-year earn-out period he was entitled to run the office as he saw fit.

12. Specifically, IAS had committed to supporting Powers with an additional, highly-paid headcount. IAS followed through on that commitment by hiring a team member and further by paying that team member's salary out of corporate's budget rather than the office budget. In other words, Powers received a new full-time employee at no cost to his office's bottom line. Separate from this additional team member, Powers wanted to hire another person to prospect new dealerships. IAS disagreed with this decision because DSS was already below the profit levels at acquisition. None of Powers' peer offices required this additional support.

13. Powers did not appear to appreciate until much later in 2019 that his office was operating far below the sales levels necessary to qualify for the first year earn-out payment. This realization came in late September 2019, when Powers contacted Lutman to advise that Powers intended to leave the company after the second earn-out year. By the second week of October 2019, Powers told Lutman that he had a plan to double the office's business in the following 13 months.

14. Aware Powers would not earn the first year earn-out payment for 2019, Defendant Robert Humble ("Humble") repeatedly went to IAS leadership to advocate that Powers be able to recoup the earn-out payments not achieved in the first year post-closing, and extend the time in which those earn-outs may be secured by one year to further incentivize Powers to improve performance in 2020. On the first occasion, Humble advocated (and IAS agreed) that Powers be paid the year one "bounty" payment (part of the year one earn-out) if Powers' year two profits exceeded what IAS had paid at closing. IAS approved this offer, yet

Powers did not accept it. On the second occasion, Humble advocated (and IAS again agreed) that Powers' earn-out period be extended by 50% by offering a third earn-out year. Yet again, IAS approved this offer and yet again Powers did not accept it. Despite Humble's advocacy and IAS's offer and willingness to provide Powers with every incentive to perform, Powers never accepted these offers; Powers instead astonishingly maintains that Humble and other IAS leadership set Powers up to fail and refused to provide him necessary support to succeed.

***Powers competed with IAS while still employed, then wiped his laptop and resigned.***

15. In early 2020, IAS leadership learned that Powers was calling other employees and industry members seeking recommendations regarding an attorney to sue IAS. Powers also told IAS employees that he intended to challenge the noncompete agreement with IAS or sit out for two years before using confidential information to steal IAS customers.

16. IAS later learned that Powers assisted competitors in reaching deals with Johnson Automotive that were contrary to IAS's interests.

17. After IAS underwent a reorganization, Powers repeatedly complained that he felt disenfranchised from his peer offices. Weekly meetings were established among these offices, but Powers frequently missed these meetings with little or no advance notice. After being gently pressed by IAS leadership to attend the meetings, Powers tendered his resignation with a long notice period. During this long notice period, IAS leadership was contacted by team members within Powers' office who disclosed Powers' self-dealing and who raised questions regarding a certain incentive program Powers had created at Johnson Automotive.

18. When Powers' self-dealing was discovered, IAS terminated Powers for cause prior to the effective date of his resignation. When Powers returned his company-issued laptop, the hard drive had been wiped. It is important to note that, given what IAS has uncovered

regarding Powers' self-dealing with clients and plans to compete with IAS, the wiping of the laptop immediately before resignation is incredibly suspicious and appears to be an effort to destroy evidence. IAS is currently working with a specialist to recover the contents Powers attempted to erase from the laptop. Upon further investigation, IAS intends to seek appropriate sanctions and a spoliation instruction.

*Powers destroyed IAS' relationship with Johnson Automotive*

19. One of the key valuation metrics in the purchase of DSS was the relationship with Johnson Automotive and the related income stream. And a key component of that relationship and the relationships with other clients was DSS and Powers who had fostered these relationship for years.

20. Powers created an incentives program for Johnson Automotive's employees—the year-end Cash Bash and Contest ("Powers' Incentive Program"). Powers did not make IAS aware that Powers' Incentive Program had not been approved by or even disclosed to Johnson Automotive's owners, or of the details surrounding the program. Instead, Powers had intentionally kept it secret from the owners. When IAS became aware of these facts, IAS contacted the owners to disclose the Powers' Incentive Program, investigate what happened between IAS employees and Johnson Automotive employees, and to attempt to salvage the relationship. It was too late. The owners made clear that they do not allow such incentive programs as a rule. Powers' duplicitous dealings—paying cash incentives to a customer's employees without the knowledge and approval of the customer—destroyed the relationship with Johnson Automotive. Powers structured the Powers' Incentive Program to pay incentives out of the commissions IAS was making on the sales by Johnson Automotive. In other words, IAS bought DSS from Powers to cement its relationship with Johnson Automotive, but Powers

created an undisclosed incentive program that ultimately severely damaged the relationship with Johnson Automotive, resulting in the loss of substantial revenue and—potentially—the loss of the entire relationship. As a result, IAS paid Powers substantial sums and provided him with substantial support and incentives, only to be rewarded with the loss of substantial revenue and a negative return on its investment.

***Powers did not disclose self-dealing.***

21.In the wake of the dispute with Johnson Automotive, IAS has learned that Powers made personal loans to a number of dealerships in his geographic area, including IAS customers and prospective customers. On information and belief, some of these loans took the form of an unsecured loan, while others took the form of buying an interest in the dealerships themselves. Powers did not disclose these interests when the transactions took place. IAS had no idea that Powers was negotiating IAS sales deals with dealerships in which Powers also owned an interest or was personally a creditor.

***IAS terminated Powers for cause and made a valid and timely claim on the Escrowed Funds.***

22.As previously stated, upon learning of Powers' duplicity with Johnson Automotive, IAS terminated Powers for cause.

23.A portion of the initial purchase price of DSS was put into escrow for two years in the event that claims arose. Upon discovery of Powers' breaches of the SPA, his duplicity with Johnson Automotive, his competition with IAS, and Powers' wiping of his laptop, IAS informed the Escrow Agent that IAS has a claim on the Escrowed Funds.

24.Stunningly, Powers maintains that he is the victim here.

## IV.
## COUNT I – BREACH OF CONTRACT

25.The allegations above are incorporated herein by reference.

26. The SPA and its ancillary agreements are enforceable agreements between Powers and IAS.

27. IAS has performed all obligations required under the SPA and its ancillary agreements.

28. Powers has violated these agreements. Specifically, Powers have violated Sections 7.01 (c) and (d) of the SPA for fraudulent activities, including but not limited to the Powers Incentive Program with Johnson Automotive, material misrepresentations and omission regarding Powers and IAS's authority to conduct such a program, and the Johnson Automotive owner's knowledge and approval of the program, and Powers' relationship as lender and/or investor in IAS's customers and prospective customers. IAS believes that Powers' fraudulent activity is further evidenced by his attempt to destroy evidence in the wiping of his IAS laptop.

29. Powers has also violated Section 6.02 of the SPA by, among other things, providing confidential information to third parties, including employees of Johnson Automotive. Powers has also breached his obligations under Section 6.04 relating to noncompetition, nonsolicitation and nondisparagement, particularly with respect to Johnson Automotive. Powers has also breached his further assurances requirements under Section 6.06 of the Purchase Agreement in connection with his moving of the Johnson Automotive business to a competitor.

30. As a result of Powers' breaches, IAS has suffered damages, including loss of the Johnson Automotive business.

31. As a result, IAS has been compelled to engage the services of the attorneys whose names are subscribed to this pleading and to agree to pay the attorney's a reasonable fee in prosecution of this claim. The SPA allows IAS to collect its attorney's fees and expenses incurred in enforcing the terms of the SPA. IAS thus seeks to recover from Powers its reasonable

attorney's fees and expenses under the SPA and Chapter 38 of the Texas Civil Practice & Remedies Code.

## V.
### COUNT II – BREACH OF FIDUCIARY DUTY

32. The allegations above are incorporated herein by reference.

33. Powers remained an officer of DSS, and as of closing became IAS's employee. Accordingly, he owed a fiduciary duty to IAS. Powers was obligated to act in IAS' interest and to disclose circumstances in which he stood to personally gain from IAS transactions. Regardless of contractual obligations, Powers was obligated to maintain IAS' confidential information and to refrain from soliciting customers or other employees.

34. Powers breached his fiduciary duty to IAS. Given the nature and structure of the relationship between the parties, Powers' fiduciary duties included the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, the duty to act with integrity of the strictest kind, the duty of honest and fair dealing, and the duty of full disclosure. Powers breached his duty to IAS by engaging in undisclosed self-dealing and by his failure to forthrightly represent the scope of his authority to engage in the Powers Incentive Program.

35. Powers' breach of fiduciary duty proximately caused harm to IAS, including but not limited to loss of the Johnson Automotive relationship and related income stream.

## VI.
### COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT

36. The allegations above are incorporated herein by reference.

37. Powers willfully and intentionally interfered with a contract. Specifically, IAS and Johnson Automotive had a contractual relationship that was valuable to IAS, as that customer represented an income stream of over $1 million. Further, Powers willfully and

intentionally interfered with that contractual relationship by implementing an unapproved and disallowed incentives program for Johnson Automotive's employees and concealing the existence of that incentive program from Johnson Automotive's owners.

38. Powers' interference with the IAS and Johnson Automotive relationship caused IAS harm by damaging and ultimately destroying IAS's relationship with Johnson Automotive.

## VII.
## COUNT IV – FRAUD BY NONDISCLOSURE

39. The allegations above are incorporated herein by reference.

40. Powers concealed and failed to disclose material facts, which Powers knew IAS was ignorant of and had no opportunity to discover. Powers concealed and failed to disclose these facts in order to buy himself more time to operate under IAS's umbrella, taking support and money from IAS while engaging in a program of spoliation and subterfuge to set up his own relationships with IAS's customers prior to his eventual resignation.

41. Specifically, in communications with Lutman in the second week of October 2019, Powers informed Lutman that he had a plan to double the office's business in the following 13 months. Relying on this information, Humble successfully advocated on Powers' behalf to IAS leadership for a revised earn-out payment to incentivize Powers' future performance.

42. Powers' performance did not improve in 2020. Powers instead devoted his time to contacting IAS's customers and negotiating transactions with those customers, concealing these communications and transactions from IAS. The information relating to how and when this fraud is peculiarly within Powers' knowledge due to his destruction of the contents of his laptop prior to his resignation. However, in a conversation with Lutman on or about November 9, 2020, Powers alluded to a loan he had provided to an IAS customer. Powers expressed concern that if

IAS did not make certain financial accommodations to the customer, the customer would be unable to pay back Powers' loan.

43. Upon these facts and upon information and belief, Powers made personal loans to IAS customers and prospective customers, some in the form of unsecured loans and others in the form of buying an interest in dealerships. Powers then lobbied IAS to provide these customers with fee waivers and reduced commissions, which IAS may not have provided had Powers not represented that such incentives were necessary in order to retain the business.

44. Powers intentionally and willfully concealed these facts from IAS. Powers was able to make these deals in part because he tendered his resignation with a lengthy notice period and was able to conceal his fraud from IAS in part because he destroyed the contents of his laptop. Powers concealed this information in order to allow him to engage in self-dealing and personal profit at IAS's expense.

45. Moreover, Powers intentionally concealed from IAS the fact that the Powers' Incentive Program had not been authorized. In fact, it is commonly known in the industry that such incentives are not done without a principal's knowledge. Had Powers not concealed these material facts, IAS could have salvaged the relationship with Johnson Automotive and retained the full benefits of that business relationship going forward.

46. IAS suffered damages as a result of acting on Powers' concealment and non-disclosure. IAS paid Powers increased sums to which he would not otherwise have been entitled, IAS lost the business with Johnson Automotive as well as income from Johnson Automotive, and IAS provided waivers and reduced financial accommodations to clients in which Powers held an ownership interest or to whom Powers had loaned money without IAS's knowledge.

# VIII.
# COUNT V – DECLARATORY JUDGMENT

47. The allegations above are incorporated herein by reference.

48. As set forth above, Powers has violated his noncompete restrictions and IAS has properly made a timely claim on the Escrowed Funds.

49. Accordingly, a controversy exists between Powers and IAS as to their rights and obligations under the SPA, Noncompetition Agreement, and Escrow Agreement. This controversy is definite, concrete, and immediate, and warrants the issuance of declaratory relief, which would resolve the controversy.

50. IAS requests a declaration of its rights under the SPA and the Noncompetition Agreement as follows:

> (1) The Noncompetition and Nonsolicitation provisions in Section 6.04 of the SPA are valid and enforceable;
> (2) Sections 2.2 and 2.4 of the Noncompetition Agreement are valid and enforceable under North Carolina law;
> (3) Powers breached the SPA and the Noncompetition Agreement.

51. IAS seeks a further declaration that IAS made a timely and proper claim on the Escrowed Funds as required by the Escrow Agreement.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant/Counter-Plaintiff IAS prays that the Plaintiff/Counter-Defendant Powers take nothing by his Complaint, that upon hearing the Court enter a finding of spoliation and award for sanctions, and that Defendant IAS recover a judgment for actual, direct, unjust enrichment, indirect, special, incidental, and consequential, and exemplary damages; reasonable attorney's fees, expenses, court fees, and associated costs; pre- and post-judgment interest; and such other and further relief, whether legal, equitable, or otherwise, to which IAS may be entitled in equity or law.

Respectfully submitted,

By: *Sabrina A. Neff*
Sabrina A. Neff
Texas Bar No. 24065813
sabrina.neff@huschblackwell.com
Benjamin Stephens
Texas Bar No. 24098472
ben.stephens@huschblackwell.com
HUSCH BLACKWELL LLP
600 Travis St., Suite 2350
Houston, Texas 77002
(713) 647-6800 – Telephone
(713) 647-6884 – Facsimile
ATTORNEYS FOR DEFENDANT
IAS PARENT HOLDINGS, INC. AND
IAS INVESTCO, INC.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Original Counterclaim against Plaintiff Gary D. Powers, II has been served upon the following on this the 12th day of February, 2021:

Joseph Y. Ahmad *Via ECF*
Jason S. McManis
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING P.C.
1221 McKinney Street, Suite 2500
Houston, TX 77010
*Counsel for Plaintiff*

By: *Sabrina A. Neff*
Sabrina A. Neff